1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10

11   MARK BATES,                    )   Civil No. 07cv0330-H (BLM)
                                    )
12              Petitioner,         )   **REPORT AND RECOMMENDATION FOR**
                                    )   **ORDER DENYING PETITION FOR**
13   v.                             )   **WRIT OF HABEAS CORPUS**
                                    )
14   KEN CLARK, Warden,             )
                                    )
15              Respondent.         )
     _____ )
16

17        This Report and Recommendation is submitted to United States

18   District Marilyn L. Huff pursuant to 28 U.S.C. § 636(b) and Civil

19   Local Rules 72.1(d) and HC.2 of the United States District Court for

20   the Southern District of California.

21        On February 20, 2007, Petitioner Mark Anthony Bates, a state

22   prisoner who is proceeding *pro se* and *in forma pauperis*, commenced

23   these habeas corpus proceedings pursuant to 28 U.S.C. § 2254.  Doc.

24   No. 1.  Petitioner challenges his conviction for second degree

25   murder.

26        This Court has considered the Petition ("Pet."), Respondent's

27   Answer and all supporting documents submitted by the parties.  For

28   the reasons set forth below, this Court **RECOMMENDS** that Petitioner's

1   Petition for Writ of Habeas Corpus be **DENIED.**

2   **FACTUAL AND PROCEDURAL BACKGROUND**

3   **A.      Petitioner's Conviction and Sentence**

4          The following facts are taken from the California Court of

5   Appeal's opinion on direct review in <u>People v. Bates,</u> No. D045113,

6   slip op. (Cal. Ct. App. Dec. 19, 2005). <u>See</u> Lodgment 5.  This Court

7   presumes the state court's factual determinations to be correct

8   absent clear and convincing evidence to the contrary.  28 U.S.C.

9   § 2254(e)(1); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003); <u>see</u>

10  <u>also</u> <u>Parke v. Raley</u>, 506 U.S. 20, 35-36 (1992) (holding findings of

11  historical fact, including inferences properly drawn from such

12  facts, are entitled to statutory presumption of correctness).

13                  FACTUAL AND PROCEDURAL BACKGROUND

14          Bates, a transient, murdered another transient,
        the victim Jose Sanchez, by repeatedly bashing his
15      head with large rocks until his head and face were
        virtually unrecognizable. The People argued at trial
16      that Bates premeditated and deliberated the crime.
        Bates did not contest the fact that he killed Sanchez.
17      Rather, Bates argued the offense was no more than
        manslaughter.

18          A.  *The Homicide*

19          At approximately 10:00 p.m. on October 21, 2003,
20      San Diego police officers responded to a 911 call made
        by Sandra Ruiz, who was inside the Centro Cultural de
21      la Raza (the center), located at the edge of Balboa
        Park.  Ruiz was rehearsing for a play.  Ruiz reported
22      to police that Bates had banged on the door to the
        center and told her to call the police because there
23      was someone outside "and it looks like they got their
        face bashed in."  Ruiz did not open the door, instead
24      viewing Bates through the video intercom system.

25          When officers arrived they found Sanchez lying
        dead on the south side of the center.  His head was
26      crushed beyond recognition until he appeared headless.
        Sanchez was surrounded by debris, most of which was
27      either blood stained or had brain tissue from the
        victim.   There were four separate rocks near the
28      victim.   It was later determined that the rocks

weighed 6.5, 10.5, 19, and 36.5 pounds.  The rocks were covered with Sanchez's blood and brain tissue.

Bates was soon discovered and contacted on the north side of the building, walking away from the scene.  His pants had blood on them.  His sweatshirt was on inside out, with no visible blood on it.  However, it was later determined that there was blood on the outside of the sweatshirt.  Bates did not seem drunk and there was no scent of alcohol on his person.  Bates asked for his backpack, which he said was by the playground area.

In response to some initial questions, Bates told police that he knew Sanchez and had banged on the door for help.  He told police that he and others, including Sanchez, had been drinking earlier and having a barbeque in the park.  The group started drinking around 3:00 pm.  Bates later left for about 40 minutes.  When he returned, he found Sanchez in the grass and thought he was asleep.  He first kicked him to try to wake him up.  He explained that he had gotten blood on his pants when he attempted to resuscitate Sanchez.  Bates also told an officer that the officer would probably hear that he and Sanchez had had a fight earlier, but explained it was "no big thing" because they were transients.  Bates asked the officer if he thought he needed a lawyer.

Medical examiner and supervising pathologist Dr. Steven Campman opined that Sanchez died as a result of blunt force impact injuries to his head.  Much of Sanchez's head above his upper lip had been "torn apart" as a result of his injuries.  He had multiple fractures of his facial bones, his jaw bone, and his skull.  Sanchez's brain had been pushed out of his skull as a result of the injuries.  Dr. Campman compared his injuries to those being caused by a person having their head smashed between a car and the road in a rollover accident or a shotgun blast to the head.  Sanchez also had fractures to the right and left ribs, a broken shoulder blade, and lung and liver lacerations, all consistent with someone jumping on his torso repeatedly.  Dr. Campman utilized a photograph of Sanchez's head area, taken at the autopsy, to assist in his testimony.

Sanchez's blood alcohol level measured 0.39 percent.  At 0.20 percent most individuals would be unconscious, unless the person had built up a tolerance to alcohol.

Blood spatter expert Brian Kennedy testified that the blood spatter on Bates's (sic) jeans and the dispersal of blood patterns up his pants suggested

that he was "relatively close," "within inches" of Sanchez when his injuries occurred. Kennedy also testified that the blood stains were inconsistent with Bates kneeling and administering CPR to Sanchez. The blood staining he observed was consistent with multiple blows. The blood staining on Sanchez indicated that he was lying on his back at the time of his injuries.

B. *Custodial Interview of Bates*

After Bates was placed in custody, he was interviewed by homicide detectives Kenneth Brown and Ed Valentine at 1:30 a.m. the following morning. Bates was given his *Miranda* warnings. Bates indicated he understood those rights, and the interview commenced. Bates initially denied murdering Sanchez, stating that he tried to give him CPR by pushing on his chest. Bates stated that he did not notice the condition of Sanchez's head because it was dark.

Bates described an incident that occurred between himself and Sanchez earlier in the day, but initially denied that the incident was violent. The interviewing detectives suggested that the argument had turned into a fight that had gotten out of control. Detective Brown asked, "Isn't that what happened?" Bates replied, "*I'm not saying anything right now.*" (Italics added.) Detective Brown explained that they were giving Bates an opportunity to clarify what happened at the scene, and told him he understood that sometimes "things get out of control." Detective Brown then asked if Bates had tried to get help for Sanchez and he replied, "I sure did."

Detective Brown explained that he believed they both knew what had happened and that he wanted to find out the truth of the matter. Detective Brown asked Bates, "Why don't you tell us what happened?" Bates replied, "I just want to know what I'm facing?" Detective Brown replied that it was up to the district attorney to make that determination and then asked, "Did you hurt that man? Why don't you just tell us what happened?" Bates responded, "Yea[h], I hurt him." Bates stated that he "got mad," picked up a rock, and "bashed" Sanchez's head in four times. Bates explained that he waited until Sanchez fell asleep, and then, using two rocks, he hit him in the head with the larger rock and in the rib cage with the second rock. Bates also admitted to kicking him "violently."

Bates later attempted to excuse his actions, claiming that Sanchez was yelling in Spanish at him right before he hit him with the rock. He also

-4-

1     claimed that Sanchez was trying to get up and hurt him
      and that before he struck him, Sanchez was "coming at
2     [him]."

3          C.  *Defense Case*

4          Raymond Murphy, a psychologist, interviewed and
      tested Bates.  He opined that Bates's IQ was 75 and
5     that he was at the borderline level of retardation.
      He also testified that Bates was dysfunctional in his
6     adaptive reasoning, making it difficult for him to
      find a place to live and work for a living.  According
7     to Murphy, Bates was capable of surviving, but could
      not adapt within a normal range of living skills.
8     Murphy scored Bates as a six- to eight-year-old in
      terms of his basic psychomotor skills.  Murphy also
9     testified that Bates functioned emotionally as an
      eight-to ten-year-old, resulting in difficulty in
10    decisionmaking, planning, setting goals, frustration
      and tolerance.  Alcohol would further impact his
11    impulse problems and frustration levels.

12         Bates's mother testified that he did not walk
      until he was over two years old, had a difficult time
13    functioning, and was "kind of slow."  He was in
      special education classes in school and his speech was
14    poor.  Bates kept to himself as a child.

15         D.  *Rebuttal*

16         Psychologist Lynette Rivers, testifying for the
      prosecution, also tested Bates.  She concluded that
17    Bates had an IQ of 79, which did not qualify as
      retarded.  Rather, Rivers testified that Bates had
18    "borderline intellectual functioning."  Bates told
      Rivers that he had no difficulty controlling his anger
19    and could not think of anything that could make him
      angry.  Rivers also noted that Bates used
20    sophisticated words when interviewed by police, which
      denoted some higher-functioning verbal abilities.
21    Bates's answers to questions indicated a degree of
      sophistication and planning as he constructed
22    different explanations for what had occurred.
      However, Rivers did admit that Bates's scores
23    indicated some neurocognitive problems that did not
      fall with the normal range and that he was functioning
24    at a level less than that of one percent of the
      population.

25

26    Lodgment 5 at 2-7.

27         On July 9, 2004, a jury found Petitioner guilty of one count

28    of second degree murder (in violation of California Penal Code

1   § 187(a)) and further found that Petitioner personally used a deadly

2   and dangerous weapon — a rock — in the commission of the murder (in

3   violation of California Penal Code § 12022(b)(1)).  Lodgment 1, vol.

4   2 at 310, 346; Lodgment 2, vol. 4 at 632.  The trial court sentenced

5   Petitioner to fifteen years to life for the murder conviction and to

6   one additional year, to run consecutive to the first sentence, for

7   using a deadly weapon, resulting in a total term of sixteen years to

8   life in prison.  Lodgment 2, vol. 4 at 644.

9   **B.**    **Direct Appeal**

10       Petitioner appealed to the California Court of Appeal, Fourth

11   Appellate District, Division One, asserting four claims for relief.

12   Lodgment 3.  Specifically, Petitioner alleged (1) that the trial

13   court deprived him of his Fifth, Sixth, and Fourteenth Amendment

14   rights by improperly allowing the jury to hear statements he made to

15   police in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436, 473-474

16   (1966) (based on the fact that he did not knowing and voluntarily

17   waive his <u>Miranda</u> rights and later unequivocally invoked his right

18   to remain silent), (2) that he was deprived of federal and state due

19   process when the trial court failed to instruct *sua sponte* on the

20   meaning of unreasonable self-defense (CALJIC 5.17), (3) that the

21   trial court abused its discretion under California Evidence Code

22   § 352 by admitting inflammatory and unnecessary photographs of the

23   victim's massive head wounds, and (4) that the cumulative effect of

24   these errors required reversal.  <u>Id.</u>  In an unpublished opinion

25   filed on December 19, 2005, the California Court of Appeal affirmed

26   the conviction.  Lodgment 5.

27       On January 18, 2006, Petitioner filed a petition for review

28   in the California Supreme Court, raising the same claims set forth

1   in his direct appeal to the appellate court with the exception of

2   the cumulative error allegation.  Lodgment 6.  On February 22, 2006,

3   the California Supreme Court summarily denied the petition for

4   review without citation of authority.  Lodgment 7.

5   **C.     <u>Collateral Review</u>**

6        Petitioner did not seek collateral review of his conviction

7   or sentence in the state courts.

8        On February 20, 2007, Petitioner filed the instant Petition

9   for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 alleging

10  three grounds for relief.  Doc. No. 1.  Respondent timely filed an

11  Answer on July 16, 2007.  Doc. No. 9.  On August 20, 2007,

12  Petitioner requested an extension of time in which to file a

13  traverse.  Doc. No. 11.  The Court granted his request and continued

14  the traverse deadline to October 1, 2007 [Doc. No. 12], but as of

15  the date of this report and recommendation, Petitioner has not filed

16  a traverse or sought an additional extension of time in which to do

17  so.

18                          <u>**STANDARD OF REVIEW**</u>

19       Title 28 of the United States Code, section 2254(a), sets

20  forth the following scope of review for federal habeas corpus

21  claims:

22            The Supreme Court, a Justice thereof, a circuit
              judge, or a district court shall entertain an
23       application for a writ of habeas corpus in behalf of
         a person in custody pursuant to the judgment of a
24       State court only on the ground that he is in custody
         in violation of the Constitution or laws or treaties
25       of the United States.

26  28 U.S.C. § 2254(a).

27       The Petition was filed after enactment of the Anti-terrorism

28  and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-

1    132, 110 Stat. 1214.   Under 28 U.S.C. § 2254(d), as amended by

2    AEDPA:

>    (d)  An application for a writ of habeas corpus on
>    behalf of a person in custody pursuant to the judgment
>    of a State court shall not be granted with respect to
>    any claim that was adjudicated on the merits in State
>    court proceedings unless the adjudication of the
>    claim—
>
>    (1) resulted in a decision that was contrary to,
>    or involved an unreasonable application of, clearly
>    established Federal law, as determined by the Supreme
>    Court of the United States; or
>
>    (2) resulted in a decision that was based on an
>    unreasonable determination of the facts in light of
>    the evidence presented in the State court proceeding.

11   28 U.S.C. § 2254(d).  Summary denials do constitute adjudications on

12   the merits.  See Luna v. Cambra, 306 F.3d 954, 960 (9th Cir. 2002).

13   Where there is no reasoned decision from the state's highest court,

14   the Court "looks through" to the underlying appellate court

15   decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).

16        A state court's decision is "contrary to" clearly established

17   federal law if the state court: (1) "arrives at a conclusion

18   opposite to that reached" by the Supreme Court on a question of law;

19   or (2) "confronts facts that are materially indistinguishable from

20   a relevant Supreme Court precedent and arrives at a result opposite

21   to [the Supreme Court's]."  Williams v. Taylor, 529 U.S. 362, 405

22   (2000).

23        A state court's decision is an "unreasonable application" of

24   clearly established federal law where the state court "identifies

25   the correct governing legal principle from this Court's decisions

26   but unreasonably applies that principle to the facts of the

27   prisoner's case."  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003).

28   "[A] federal habeas court may not issue a writ simply because the

court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly . . . . Rather, that application must be *objectively unreasonable*." <u>Andrade</u>, 538 U.S. at 75-76 (emphasis added) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions." <u>Williams</u>, 529 U.S. at 412.

Finally, habeas relief is also available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court." 28 U.S.C. § 2254(d)(2). A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in the state court proceeding. <u>See</u> <u>Miller-El</u>, 537 U.S. at 340; <u>see</u> <u>also</u> <u>Rice v. Collins</u>, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## DISCUSSION

Petitioner raises three grounds for relief in the instant petition. In Ground 1, Petitioner challenges the state court's determination that he knowingly and voluntarily waived his <u>Miranda</u> rights and that he did not unequivocally invoke his right to remain silent. Pet. at 6. In Ground 2, Petitioner argues that his federal

1  due process rights were violated when the trial court failed to
2  instruct the jury on unreasonable self-defense.  Id. at 7.  Finally,
3  in Ground 3, Petitioner challenges the trial court's admission into
4  evidence of inflammatory and unnecessary photographs of the victim's
5  massive head wounds.  Id. at 8.

6      In his Memorandum of Points and Authorities in Support of the
7  Answer ("Resp't Mem."), Respondent addresses all three claims on the
8  merits.  See Resp't Mem. at 11-22.  Specifically, Respondent
9  contends that the Court of Appeal's decisions as to all three claims
10  were neither contrary to, nor unreasonable applications of, United
11  States Supreme Court precedent.  Id.

12      In evaluating the merits of Petitioner's claims, this Court
13  must look through to the last reasoned state court decision.  See
14  Ylst, 501 U.S. at 801-06.  Here, because the California Supreme
15  Court summarily denied Petitioner's petition on direct review, the
16  last reasoned state court decision on all of the claims presented in
17  this case came from the California Court of Appeal.  Lodgment 5.

18  **A.    Ground 1 - Petitioner's Confession**

19      Petitioner alleges in his first claim for relief that the
20  state court erred by determining that he knowingly and voluntarily
21  waived his Miranda rights and that he did not unequivocally invoke
22  his right to remain silent.  Pet. at 6-7[1].  Petitioner argues that
23  his limited cognitive abilities prevented him from freely waiving
24  his rights and made him more susceptible to the coercive tactics
25  utilized by the interrogating officers.  Id.

26

27  _____

    [1]    The Petition contains two pages numbered as "7".  In this instance,
28  the Court refers to the second one, which contains a continuation of Ground 1.

1   Respondent counters that the California state court's

2   determination that Petitioner's <u>Miranda</u> rights were not violated was

3   neither contrary to, nor an unreasonable application of, clearly

4   established federal law, nor was it based on an unreasonable

5   determination of the facts.  Resp't Mem. at 11.  Respondent argues

6   that the circumstances of Petitioner's initial waiver as well as

7   those surrounding his subsequent statement about not wanting to talk

8   support the state court's conclusion.  <u>Id.</u> at 11-15.

9       **1.   <u>Waiver of Miranda Rights</u>**

10   Petitioner first alleges that he did not knowingly and

11   voluntarily waive his <u>Miranda</u> rights.   The Court of Appeal

12   considered and rejected this claim on the following grounds:

13   After being advised of his *Miranda* rights, Bates
     affirmatively told the detectives that he understood
14   those rights.  There is no evidence in the record of
     the interview that Bates lacked sufficient
15   intelligence to understand those rights or the
     consequences of his waiver.  There is no evidence that
16   the questioning by detectives was overbearing or that
     they employed intimidation, coercion, or deception to
17   make Bates waive his *Miranda* rights.

18   Indeed, when ruling on the admissibility of the
     interrogation, the court viewed a videotape of that
19   interview to determine the merits of Bates's claim
     that he was "intellectually helpless to assert his
20   rights."  In rejecting this contention, the court
     noted Bates's "initial deceptive claim that the blood
21   on his pants was the result of an attempt to perform
     CPR on the victim, his sophisticated questions
22   regarding the legal consequences of his actions, his
     reflective analysis of his mental state when he
23   attacked the victim and his skillful alteration of the
     facts of his story following his confession...."  The
24   court found these facts demonstrated that Bates
     possessed "[a] keen understanding of his situation."
25   The court also found that at all times Bates displayed
     a willingness and desire to communicate with the
26   detectives and that the interrogation was not
     coercive.  We must accept the trial court's resolution
27   of disputed facts and inferences, and its evaluations
     of credibility, where, as here, they are supported by
28   substantial evidence.  (*Box, supra,* 23 Cal.4th at

1                p. 1194.)   The court did not err in finding that
Bates's waiver of his *Miranda* rights was knowingly and
2                intelligently made.

3    Lodgment 5 at 12-13.

4        This Court must determine whether the Court of Appeal's

5    opinion is contrary to, or an unreasonable application of, clearly

6    established Supreme Court law.   Under clearly established federal

7    law, a suspect who is subjected to custodial interrogation must be

8    advised of his federal constitutional right to remain silent and his

9    right to an attorney before questioning commences.   <u>Miranda v.</u>

10   <u>Arizona</u>, 384 U.S. 436, 444 (1966).   A defendant may waive his

11   <u>Miranda</u> rights "provided the waiver is made voluntarily, knowingly

12   and intelligently." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).   A

13   waiver is "voluntary" if "it was the product of a free and

14   deliberate choice rather than intimidation, coercion, or deception."

15   <u>Id.</u>   It is "knowingly and intelligently" made if the defendant had

16   "full awareness of both the nature of the right being abandoned and

17   the consequences of the decision to abandon it." <u>Id.</u>; <u>U.S. v. Doe</u>,

18   155 F.3d 1070, 1074 (9th Cir. 1998).   "Only if the 'totality of the

19   circumstances surrounding the interrogation' reveal both an

20   uncoerced choice and the requisite level of comprehension may a

21   court properly conclude that the *Miranda* rights have been waived."

22   <u>Moran</u>, 475 U.S. at 421.

23          **a.**   <u>**Voluntary Waiver**</u>

24        Petitioner contends that he did not voluntarily waive his

25   <u>Miranda</u> rights because the officers used coercive tactics to which

26   he was particularly susceptible due to his limited cognitive

27   abilities.   Pet. at 6.   As previously discussed, a waiver is

28   "voluntary" if "it was the product of a free and deliberate choice

1    rather than intimidation, coercion, or deception." <u>Moran</u>, 475 U.S.

2    at 421.  "The sole concern of the Fifth Amendment, on which <u>Miranda</u>

3    was based, is governmental coercion."  <u>Colorado v. Connelly</u>, 479

4    U.S. 157, 169-170 (1986).  "[W]hile mental condition is surely

5    relevant to an individual's susceptibility to police coercion, mere

6    examination of the confessant's state of mind can never conclude the

7    due process inquiry."  <u>Id.</u> at 520-21.

8         Here, the evidence does not support Petitioner's argument

9    that the interrogating officers used coercive tactics in obtaining

10   his waiver or his claim that his cognitive difficulties prevented

11   him from voluntarily waiving his rights.  As an initial matter,

12   there is no indication in the record that Petitioner was handcuffed

13   during the interview or treated roughly while being brought into the

14   interrogation room.  <u>See</u>, <u>e.g.</u>, Lodgment 1 at 202-04.  And, the only

15   questions the officers asked Petitioner before informing him of his

16   <u>Miranda</u> rights were basic informational questions such as the

17   spelling of his name, where he lived, his age, his level of

18   education and the phone number of any family contacts.  <u>Id.</u>   When

19   Detective Brown read Petitioner his <u>Miranda</u> rights, he confirmed

20   Petitioner's agreement after each one by asking "[d]o you

21   understand?"  <u>Id.</u> at 204.  Petitioner responded each time Detective

22   Brown asked if he understood by saying "Yea" or "I sure do."  <u>Id.</u>

23   Detective Brown then asked "Do you want to tell me what happened

24   tonight out there[?]" and Petitioner immediately began talking.  <u>Id.</u>

25   He did not ask any questions about his rights or express any

26   uncertainty.  <u>Id.</u>  As such, none of the circumstances surrounding

27   Petitioner's waiver suggest that any police coercion occurred or

28   that his waiver was anything but free and deliberate.

1    Having considered the totality of the circumstances, <u>Moran</u>,

2    475 U.S. at 421, this Court finds there is no evidence of police

3    overreaching and concludes that the Court of Appeal did not

4    unreasonably apply federal law in determining that Petitioner

5    voluntarily waived his <u>Miranda</u> rights.

### b.   <u>Knowing and Intelligent Waiver</u>

7    Petitioner also suggests that his waiver was not knowing and

8    intelligent due to his limited cognitive faculties.  Pet. at 6-7.

9    He cites to an expert's trial testimony that Petitioner is within

10   the mild range of mental retardation, has the emotional range of an

11   eight to ten year old, was in special education classes as a child,

12   and likely suffered brain damage at an early age.  <u>Id.</u> at 6.

13   Again, a waiver is only "knowingly and intelligently" made if

14   the defendant had "full awareness of both the nature of the right

15   being abandoned and the consequences of the decision to abandon it."

16   <u>Moran</u>, 475 U.S. at 421; <u>Doe</u>, 155 F.3d at 1074.   However, "[t]he

17   Constitution does not require that a criminal suspect know and

18   understand every possible consequence of a waiver of the Fifth

19   Amendment privilege." <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987).

20   In analyzing the totality of the circumstances, the court may

21   consider several factors including "(i) the defendant's mental

22   capacity; (ii) whether the defendant signed a written waiver;

23   (iii) whether the defendant was advised in his native tongue or had

24   a translator; (iv) whether the defendant appeared to understand his

25   rights; (v) whether the defendant's rights were individually and

26   repeatedly explained to him; and (vi) whether the defendant had

27   prior experience with the criminal justice system." <u>U.S. v. Crews</u>,

28   502 F.3d 1130, 1140 (9th Cir. 2007).  While "[a] defendant's mental

capacity directly bears upon the question of whether he understood the meaning of his Miranda rights and the significance of waiving his constitutional rights," U.S. v. Garibay, 143 F.3d 534, 538 (9th Cir. 1998), courts repeatedly have found that defendants with varying degrees of mental impairment nonetheless retained the capacity to knowingly and voluntarily waive their Miranda rights. See, e.g., Derrick v. Peterson, 924 F.2d 813, 816 (9th Cir. 1990) (finding that defendant with mental age of a nine year old and an I.Q. of 62 was capable of understanding and knowingly and intelligently waiving Miranda rights); U.S. v. Glasgow, 451 F.2d 557, 558 (9th Cir. 1971) (rejecting defendant's argument that he was "of such limited mental capacity that he was incapable of having made a knowing and intelligent waiver" of his Miranda rights); U.S. v. Rosario-Diaz, 202 F.3d 54, 69 (1st Cir. 2000) (upholding waiver by defendant with I.Q. in mid-70s and no prior experience with the criminal justice system over objection that waiver was not knowingly and intelligently made).

In this case, several factors weigh against Petitioner's claim. First, Detective Brown read Petitioner each of his rights individually and Petitioner confirmed that he understood each one. See U.S. v. Bautista-Avila, 6 F.3d 1360, 1366 (9th Cir. 1993) (finding it particularly significant in upholding intelligence of waiver that defendant affirmatively indicated that he understood his rights). Second, the dialogue in the record reflects that Petitioner understood his rights as he did not ask any questions or otherwise signal that he was confused. Lodgment 1 at 202-04. Additionally, there is no evidence suggesting that Petitioner was not a native English speaker so he was advised of his rights in his

1    native language.    _Id._    Third, the probation officer's report

2    indicates that Petitioner has been arrested on two prior occasions,

3    at least one of which resulted in a conviction, which suggests that

4    he previously has been advised of his _Miranda_ rights and understands

5    the rights involved.    While Petitioner may well have cognitive

6    deficiencies, these do not _per se_ bar the Court from finding that he

7    intelligently waived his _Miranda_ rights.    _See_, _e.g._, _Derrick_, 924

8    F.2d at 816; _Glasgow_, 451 F.2d at 558; _Rosario-Diaz_, 202 F.3d at 69.

9    Therefore, this Court finds under the totality of the circumstances

10   that the Court of Appeal did not unreasonably apply clearly

11   established federal law in concluding that Petitioner knowingly and

12   intelligently waived his rights.

13              **c.   <u>Invocation of the Right to Silence</u>**

14        Petitioner also implies that the officers relied on coercive

15   tactics and Petitioner's limited cognitive abilities to prevent

16   Petitioner from invoking his right to remain silent.    Pet. at 6-7.

17        In adjudicating this claim, the Court of Appeal rejected

18   Petitioner's argument that his statement "I'm not saying anything

19   right now" was a clear and unambiguous invocation of the right to

20   remain silent and mandated cessation of questioning.    Lodgment 5 at

21   8-9.    After setting forth the _Miranda_ standard and applicable

22   California case law, the appellate court concluded:

23                  Bates's statement is similar to those cited above
                 and, under the circumstances, did not amount to an
24               unequivocal assertion on his right to remain silent.
                 Prior to the statement, he had given a false version
25               of what had occurred.  His statement, in context, that
                 "I'm not saying anything right now" only indicated an
26               unwillingness to talk about certain subjects.  At most
                 it sought to alter the course of the detectives'
27               questions, not stop the interview altogether.
                 Further, he gave no indication that he wanted the
28               interview stopped, and continued to answer the

1    officers' questions.  The trial court correctly found
     that Bates did not unequivocally invoke his right to
2    remain silent.

3    Id. at 11.   The Court of Appeal thus affirmed the trial court's

4    decision to admit Petitioner's confession into evidence.  Id. at 20.

5        The Supreme Court made clear in Miranda v. Arizona that a

6    suspect may cut off questioning at any time during a custodial

7    interrogation:

8            Once warnings have been given, the subsequent
         procedure is clear.  If the individual indicates in
9        any  manner,  at  any  time  prior  to  or  during
         questioning, that he wishes to remain silent, the
10       interrogation must cease.  At this point he has shown
         that  he  intends  to  exercise  his  Fifth  Amendment
11       privilege;  any  statement  taken  after  the  person
         invokes his privilege cannot be other than the product
12       of compulsion, subtle or otherwise.  Without the right
         to  cut  off  questioning,  the  setting  of  in-custody
13       interrogation operates on the individual to overcome
         free  choice  in  producing  a  statement  after  the
14       privilege has been once invoked.

15   Miranda, 384 U.S. at 473-474.   In subsequently interpreting the

16   Miranda opinion, the Supreme Court concluded that "the admissibility

17   of statements obtained after the person in custody has decided to

18   remain silent depends under Miranda on whether his 'right to cut off

19   questioning' was 'scrupulously honored.'"   Michigan v. Mosley, 423

20   U.S. 96, 104 (1975).

21       The question of how clear the suspect's assertion of the

22   right to remain silent must be has been addressed by analogy to

23   cases pertaining to invocation of the right to have an attorney

24   present.   See Arnold v. Runnels, 421 F.3d 859, 866 n.8 (9th Cir.

25   2005).   Thus, a brief history of law regarding the right to an

26   attorney is instructive.   In Edwards v. Arizona, 451 U.S. 477

27   (1981), the Supreme Court made clear that law enforcement officers

28   must cease questioning immediately if the suspect clearly asserts

1   his or her right to have counsel present during the custodial

2   interrogation. But, "if a suspect makes a reference to an attorney

3   that is ambiguous or equivocal in that a reasonable officer in light

4   of the circumstances would have understood only that the suspect

5   *might* be invoking the right to counsel," the interrogating officers

6   are not required to cease questioning the suspect. <u>Davis v. United</u>

7   <u>States</u>, 512 U.S. 452, 459 (1994). As the reference to "a reasonable

8   officer" implies, whether or not the invocation is ambiguous is an

9   objective inquiry. <u>Id.</u> at 458-59 (citing <u>Connecticut v. Barrett</u>,

10   479 U.S. 523, 529 (1987)). And, while the officer is not required

11   to bring the interrogation to a halt in the face of an ambiguous

12   invocation of the right to counsel, the Supreme Court has admonished

13   that "when a suspect makes an ambiguous or equivocal statement it

14   will often be good police practice for the interviewing officers to

15   clarify whether or not he actually wants an attorney" before

16   proceeding. <u>Id.</u> at 461. The Court declined, however, to *require*

17   officers to ask clarifying questions. <u>Id.</u>

18        In determining whether a suspect has unambiguously invoked

19   his <u>Miranda</u> rights, the words of a <u>Miranda</u> request should be

20   "understood as ordinary people would understand them." <u>Barrett</u>, 479

21   U.S. at 529; <u>Arnold</u>, 421 F.3d at 864. The suspect need not "speak

22   with the discrimination of an Oxford don." <u>Davis</u>, 512 U.S. at 459

23   (internal citation omitted); <u>Arnold</u>, 421 F.3d at 865 (noting that

24   "in applying <u>Davis</u>, neither the Supreme Court nor this court has

25   required that a suspect seeking to invoke his right to silence

26   provide any statement more explicit or technically-worded than 'I

27   have nothing to say'"). Nor is any "talismanic phrase, such as 'I

28   invoke my right to silence under the Fifth Amendment'" required.

1   <u>Arnold</u>, 421 F.3d at 866; <u>see also</u> <u>Emspak v. United States</u>, 349 U.S.

2   190, 194 (1955) ("no ritualistic formula or talismanic phrase is

3   essential in order to invoke the privilege against

4   self-incrimination").

5       On habeas review, great deference is given to the state

6   court's factual and legal determinations.  In order to reverse under

7   AEDPA, this Court must find either (1) that the Court of Appeal's

8   factual findings were unreasonable and Petitioner rebutted them with

9   clear and convincing evidence (28 U.S.C. § 2254(d)(2)) or (2) that

10  this determination is a question of law and the Court of Appeal's

11  decision unreasonably applied clearly established federal law (28

12  U.S.C. § 2254(d)(1)).[2]  Here, Petitioner does not dispute the facts

13  surrounding the alleged invocation of his right to silence but,

14  rather, challenges the court's legal determination that the

15  statement "I'm not saying anything right now" was not an unequivocal

16  invocation of his right to remain silent.

17      In the instant case, Petitioner's confession was tape-

18  recorded and the trial court reviewed the tape prior to making its

19  determination.  Lodgment 5 at 12.  The transcript reveals that

20  before making the challenged statement, Petitioner described the

21  relevant events to the officers.  Lodgment 1 at 202-221.  Petitioner

22  explained that he knew the victim, that the victim watched his

23  belongings for about two hours while Petitioner went somewhere else,

24  that Petitioner returned to the area and discovered the victim but

25  did not notice anything unusual about the victim's head, that he

26

27  _____

28      [2]   <u>See</u> <u>Anderson v. Terhune</u>, 467 F.3d 1208, 1212-13 (9th Cir. 2006), *en banc rehearing granted*, 486 F.3d 1155 (9th Cir. May 14, 2007) (No. 04-17237).

knelt on the ground and administered CPR to the victim, and that he then went to a nearby building to get help. Id. at 202-08. During this part of the transcript, the officers encouraged Petitioner to provide a detailed account of his evening but did not significantly challenge the story. Id. However, after hearing the story, the officers explained to Petitioner that they did not believe he was telling them the complete story and they began to challenge him on specific details of his story and how his story might conflict with other evidence or testimony. Id. at 208-20. In response, Petitioner admitted that he had drunk alcohol during the evening, that he had had a "peaceful argument" with the victim earlier in the day, and that he had nudged the victim with his foot when he first discovered the body. Id. Petitioner again insisted that he had attempted CPR on the victim but had not noticed the condition of the victim's head. Id. at 221. The officers then presented Petitioner with an alternative theory of what transpired that evening. Id. It was in response to this alternative theory that Petitioner made the challenged statement, asserting that "I'm not saying anything right now." Id.

After reviewing these facts by referencing the taped confession and applying the correct law, the appellate court concluded that in context and under the totality of the circumstances, a reasonable officer would not have considered Petitioner's statement to be an unambiguous assertion of his right to remain silent. Lodgment 5 at 7-11. While this Court might reach a different conclusion if the issue were presented to it initially, this Court cannot say that the Court of Appeal's conclusion was unreasonable. See Rice, 546 U.S. at 341-42 (the fact that

1   "[r]easonable minds reviewing the record might disagree" does not

2   render a decision objectively unreasonable); Andrade, 538 U.S. at

3   75-76 ("a federal habeas court may not issue a writ simply because

4   the court concludes in its independent judgment that the relevant

5   state-court decision applied clearly established federal law

6   erroneously or incorrectly . . . . Rather, that application must be

7   objectively unreasonable").   Because clearly established Supreme

8   Court law does not dictate that Petitioner's statement was an

9   unequivocal invocation of his right to silence nor does it require

10  the officers to make a specific inquiry after such a statement, and

11  because the state court's conclusion was not objectively

12  unreasonable, Petitioner's claim fails.

13       Even if the Court of Appeal's decision was unreasonable, the

14  error was harmless.  The Supreme Court has "repeatedly recognized

15  that the commission of a constitutional error at trial alone does

16  not entitle a defendant to automatic reversal." Washington v.

17  Recuenco, 548 U.S. 212, __, 126 S.Ct. 2546, 2551 (2006). Unless the

18  case presents one of the rare situations where the error is

19  structural and requires automatic reversal, the constitutional error

20  is subject to harmless error analysis.   Id. (listing structural

21  errors as including: complete denial of counsel, biased trial judge,

22  racial discrimination in selection of grand jury, denial of self-

23  representation at trial, denial of public trial, and defective

24  reasonable-doubt instruction) (internal citations omitted); see also

25  Arizona v. Fulminante, 499 U.S. 279, 295 (1991) (distinguishing

26  prior precedent in determining that harmless error analysis does

27  apply to coerced confessions).  The harmless error analysis dictates

28  that an error is harmless if the court can say with fair assurance

that the error did not have "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)); <u>Arnold</u>, 421 F.3d at 867.

In this case, there was overwhelming evidence establishing that Petitioner killed the victim. The question as presented at trial was whether the killing constituted first degree murder, second degree murder, voluntary manslaughter, or involuntary manslaughter. The jury was instructed on all four crimes. Lodgment 2, vol. 4 at 600-17. The jury rejected the first degree murder allegation and convicted Petitioner of second degree murder. Lodgment 1 at 310, 346; Lodgment 2, vol. 4 at 632. The trial judge told the jury that the difference between second degree murder and manslaughter is that second degree murder requires malice aforethought whereas voluntary manslaughter mandates that there be no malice aforethought but requires an intent to kill or killing with conscious disregard for human life. Lodgment 2, vol. 4 at 609. The trial judge explained that:

> Malice, as used in malice aforethought, may be either express or implied.
>
> Malice is express when there is manifested an intention unlawfully to kill a human being.
>
> Malice is implied when:
>
> 1. The killing resulted from an intentional act;
>
> 2. The natural consequences of the act are dangerous to human life; and
>
> 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

<u>Id.</u> at 606-07. The judge further explained that "[t]here is no

malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury." Id. at 609.   Accordingly, the harmless error analysis focuses on whether the portion of Petitioner's confession after the alleged invocation of silence had "a substantial and injurious effect or influence" on the jury's conclusion that Petitioner possessed malice aforethought as required for second degree murder.

If the challenged portion of Petitioner's confession is excluded, the remaining evidence establishes that Petitioner told Ms. Ruiz at approximately 10:00 p.m. that she should call the police because someone was outside "and it looks like they got their face bashed in." Lodgment 5 at 2.   Officers responded and discovered the victim with his "head crushed beyond recognition until he appeared almost headless."   Id. at 3.   A doctor described the victim's head injuries as similar to those sustained by a "person having their head smashed between a car and the road in a rollover accident or a shotgun blast to the head."   Id. at 4.   Four rocks, weighing 6.5, 10.5, 19, and 36.5 pounds, were discovered near the body covered with the victim's blood and brain tissue.   Id. at 3.   The physician also testified that the victim had injuries consistent with "someone jumping on his torso repeatedly."   Id. at 4.   Petitioner's statements during the first part of his confession (prior to his statement that he's not saying anything right now) establish that he knew the victim, that he had had a "peaceful argument" with the victim earlier in the day, that he returned to the location where the victim was located and where the argument had occurred and

1  discovered the victim, that he performed CPR on the victim but did
2  not notice the condition of the victim's head, and that he then went
3  to a nearby building to get help.  Id. at 3; Lodgment 1 at 202-21.
4  Another physician testified that the victim's blood was on
5  Petitioner's jeans, that the blood patterns on Petitioner's jeans
6  indicated that Petitioner was "within inches" of the victim when the
7  victim was injured, that the blood stains on Petitioner's jeans were
8  inconsistent with Petitioner "kneeling and administering CPR" to the
9  victim, and that the blood staining indicated that the victim
10 sustained multiple blows while lying on his back.  Id. at 4.
11 Because no one else was present when the attack occurred[3], if the
12 rest of Petitioner's confession had been suppressed, there would not
13 have been any evidence presented to the jury that Petitioner
14 believed he acted in self-defense.[4]

15

16    [3]    Karen Clasey described the altercation that occurred between
   Petitioner and the victim earlier in the day.  Lodgment 2 at 225-32; 240-45.  Ms.
17 Clasey described the victim as a person who could become abusive when he drank
   and Petitioner as someone who usually remained quiet and by himself.  Id.  Ms.
18 Clasey testified that the fight had ended and the victim still was alive when she
19 left the location.  Id.

20    [4]    Petitioner did not say anything about his fear of the victim or his
21 belief that the victim was going to attack him until after he stated that he was
   "not saying anything right now."  Lodgment 1 at 202-45.  In the portion of his
22 confession after the challenged statement, Petitioner admitted that he used the
23 rocks to bash the victim's head and rib cage and that he violently kicked the
   victim.  Id. at 222-45.  Petitioner also explained that he drank several beers,
24 that he lost his temper, that the victim made him really angry, and that he hit
25 the victim because he believed the victim was going to attack him.  Id.  The
   facts asserted in this portion of Petitioner's statement support the arguments
26 for both first degree and voluntary manslaughter.  Because the jury rejected both
27 crimes, there is no evidence that the allegedly improper portion of the
   confession affected the jury's verdict.  Accordingly, the error in admitting that
28 portion of the Petitioner's statement, if any, was harmless.

1    Without the challenged portion of Petitioner's confession,

2    there is overwhelming evidence that Petitioner killed the victim

3    with malice aforethought.  The size and number of rocks used and the

4    devastating damage inflicted on the victim's head easily supports

5    the jury's conclusion that Petitioner deliberately and intentionally

6    threw the rocks on the victim's head knowing that such an act likely

7    would endanger the victim's life and that he did so after he fought

8    with the victim earlier in the day.  This conclusion is reinforced

9    by the blood evidence and Ms. Ruiz' 911 statement, which establish

10   that Petitioner lied on several critical issues, including how the

11   victim's blood got on him, that he attempted CPR, and that he did

12   not notice the devastating damage to the victim's head.  Finally,

13   without the challenged portion of Petitioner's confession, there is

14   no evidence negating the malice aforethought evidence because

15   Petitioner's confession offers the only evidence that the victim

16   presented an immediate danger at the time of the killing or that

17   Petitioner perceived such a danger.  Given this evidence, the Court

18   concludes that there is a fair assurance that the admission of the

19   portion of Petitioner's confession after the challenged statement

20   did not have a substantial and injurious effect or influence in

21   determining the jury's verdict.  <u>Brecht</u>, 507 U.S. at 637.

22   Accordingly, the error in admitting the remainder of Petitioner's

23   confession, if any, was harmless.

24   In sum, this Court finds that the California Court of

25   Appeal's decision denying Petitioner's first claim was not contrary

26   to, or an unreasonable application of, clearly established federal

27   law, nor was it an unreasonable determination of the facts in light

28   of the evidence presented.  28 U.S.C. § 2254(d).  The Court,

1  therefore, **RECOMMENDS** that Petitioner's first ground for habeas
2  relief be **DENIED**.

3  **B.**     **Ground 2 - Failure to Instruct on Unreasonable Self-Defense**

4         Petitioner contends that the trial court erred by not, *sua*
5  *sponte*, instructing the jury on the definition of unreasonable self-
6  defense (CALJIC No. 5.17) and, consequently, violated his federal
7  due process rights.   Pet. at 7.   He acknowledges the Court of
8  Appeal's argument that substantial evidence of that defense was not
9  present and that, even if it was, the defense was appropriately
10  covered by other instructions so as to render any error harmless.
11  Id.  However, because unreasonable self-defense was never *defined* in
12  any of these other instructions, Petitioner argues that the trial
13  court should have separately instructed on this critical aspect of
14  Petitioner's defense.   Id.; Lodgment 6 at 11-12.

15        In response, Respondent argues that Petitioner's claim fails
16  to state a federal question.   Resp't Mem. at 15.   Even if it does,
17  Respondent submits that the state court's conclusion was not
18  unreasonable.   Id.

19         **1.    Federal Question**

20        As a preliminary matter, this Court notes that only claims
21  alleging a violation of "the Constitution, laws, or treaties of the
22  United States" are cognizable on federal habeas review.   Estelle v.
23  McGuire, 502 U.S. 62, 67-68 (1991); see also 28 U.S.C. § 2254(a).
24  Consequently, to ensure a federal court's review of his claims for
25  relief, a habeas petitioner must allege he is in custody "in
26  violation of the Constitution or the laws or treaties of the United
27  States," see 28 U.S.C. § 2254(a), by citing "provisions of the
28  federal Constitution or  . . . either federal or state case law that

1  engages in a federal constitutional analysis," <u>Fields v. Waddington</u>,

2  401 F.3d 1018, 1021 (9th Cir. 2005) (explaining requirements for

3  exhaustion purposes).

4       In his second claim, Petitioner merely asserts that he was

5  denied due process of law as guaranteed under the federal

6  constitution, without specifying any particular constitutional

7  provision.  Pet. at 7.  Because federal courts are obligated to

8  construe *pro se* pleadings liberally, <u>see</u> <u>Barron v. Ashcroft</u>, 358

9  F.3d 674, 676 (9th Cir. 2004), this Court interprets Petitioner's

10  claim as alleging that the instructional error violated his

11  constitutional Due Process rights under the Fourteenth Amendment.

12  Such an allegation undeniably states a cognizable claim for habeas

13  relief.  Accordingly, this Court finds that Petitioner has alleged

14  a federal violation sufficient to enable review of his claim.

15       **2.  <u>Federal Relief</u>**

16       Respondent contends that Petitioner's claim that the state

17  court failed to adequately define unreasonable self-defense

18  challenges only the state court's interpretation of state law and,

19  as such, is not cognizable on federal habeas review.  Resp't Mem. at

20  16.  Respondent is correct that this claim is not cognizable on

21  federal habeas review because habeas relief is not available for an

22  alleged error in the interpretation or application of state law.

23  <u>Estelle</u>, 502 U.S. at 67-68; <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919

24  (9th Cir. 1991); <u>see also</u> <u>Dugger v. Adams</u>, 489 U.S. 401, 409 (1989)

25  ("the availability of a claim under state law does not of itself

26  establish that a claim was available under the United States

27  Constitution").

28       However, to the extent Petitioner argues that the jury was

1    not instructed on a viable defense that was supported by the
2    evidence, in violation of his federal constitutional rights, this
3    claim is cognizable.   Instructional error will support a petition
4    for federal habeas relief if it is shown "not merely that the
5    instruction is undesirable, erroneous, or even 'universally
6    condemned,'" Cupp v. Naughten, 414 U.S. 141, 146 (1973), but that
7    "the ailing instruction by itself so infected the entire trial that
8    the resulting conviction violates due process," id. at 147.   "This
9    standard for instructional error applies to ambiguous or omitted
10   instructions." Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir.
11   2001).   "An appraisal of the significance of an error in the
12   instructions to the jury requires a comparison of the instructions
13   which were actually given with those that should have been given."
14   Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Murtishaw, 255 F.3d at
15   971.

16        Even if the omission in the instructions is found to have
17   violated a petitioner's right to due process, a habeas petitioner
18   can obtain relief only if the unconstitutional instructions had a
19   substantial influence on the conviction and thereby resulted in
20   actual prejudice under Brecht.   Brecht requires a court to determine
21   whether the constitutional error "'had a substantial and injurious
22   effect or influence in determining the jury's verdict.'"   Brecht,
23   507 U.S. at 637.   Trial errors that do not meet this test are deemed
24   harmless.   See Bonin v. Calderon, 59 F.3d 815, 823-24 (9th Cir.
25   1995); Williams v. Calderon, 52 F.3d 1465, 1476 (9th Cir. 1995)
26   (failure to instruct on element of kidnapping special circumstance
27   subject to Brecht harmless error review).

28        In this case, Petitioner contends that the trial court had a

1  duty to instruct the jury *sua sponte* under CALJIC No. 5.17, which

2  provides:

> A person who kills another person in the actual but
> unreasonable belief in the necessity to defend against
> imminent peril to life or great bodily injury, kills
> unlawfully but does not harbor malice aforethought and
> is not guilty of murder.  This would be so even though
> a reasonable person in the same situation seeing and
> knowing the same facts would not have had the same
> belief.  Such an actual but unreasonable belief is not
> a defense to the crime of [voluntary] [or]
> [involuntary] manslaughter. [¶]  As used in this
> instruction, an "imminent" [peril] [or] [danger] means
> one that is apparent, present, immediate and must be
> instantly dealt with, or must so appear at the time to
> the slayer.  [¶]  [However, this principle is not
> available, and malice aforethought is not negated, if
> the defendant by [his] [her] [unlawful] [or]
> [wrongful] conduct created the circumstances which
> legally justified [his] [her] adversary's [use of
> force], [attack] [or] [pursuit].]  [¶]  [This
> principle applies equally to a person who kills in
> purported self-defense or purported defense of another
> person.]

15  Lodgment 5 at 14.  As the Court of Appeal highlighted, the trial

16  court did instruct the jury on voluntary and involuntary

17  manslaughter under CALJIC Nos. 8.40 and 8.45, "both of which told

18  the jurors there is no malice aforethought if the killing occurred

19  'in the honest but unreasonable belief in the necessity to defend

20  oneself against imminent peril to life or great bodily injury.'"

21  Lodgment 5 at 16; Lodgment 2, vol. 4 at 609 (instruction to the jury

22  on voluntary manslaughter) & 612 (instruction to the jury on

23  involuntary manslaughter).  Thus, the crux of Petitioner's claim is

24  that the trial court's failure to further clarify the unreasonable

25  self-defense concept by way of a separate instruction "so infected

26  the entire trial that the resulting conviction violates due

27  process." Estelle, 502 U.S. at 71-72.

28          The Court of Appeal concluded that the trial court had no

-29-

duty to instruct *sua sponte* on unreasonable self-defense because there was no substantial evidence that Petitioner killed Sanchez in the unreasonable belief that he was acting in self-defense. Lodgment 5 at 15.  "As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  Matthews v. United States, 485 U.S. 58, 63 (1988) (noting that "[a] parallel rule has been applied in the context of a lesser included offense instruction").  In other words, due process requires defense instructions to be given only when the evidence warrants such an instruction.  See Hopper v. Evans, 456 U.S. 605, 611 (1982).  Under California law, unreasonable self-defense is not actually a defense, but rather a shorthand description of one form of voluntary manslaughter.  People v. Barton, 12 Cal. 4th 186, 200 (1995).  "Accordingly, when a defendant is charged with murder the trial court's duty to instruct sua sponte, or on its own initiative, on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense."  Id. at 201.  The duty arises whenever there is substantial evidence that "the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense."  Id.  In this case, the Court of Appeal noted that Petitioner confessed to voluntarily killing Sanchez while he was sleeping.  Lodgment 5 at 15.  It found that Petitioner's "later attempt to justify the killing by telling detectives that Sanchez had 'come at him' was simply not credible, nor was his initial statement that the blood got on his clothes because he was performing CPR on Sanchez."  Id.  As such, the Court of Appeal

concluded that the trial court had no duty to instruct *sua sponte* with CALJIC 5.17 because there was not substantial evidence in the record that Petitioner honestly believe he was in imminent peril. Id. at 15-16.

On this record, this Court finds that the Court of Appeal's determination of the facts was reasonable.  Unreasonable self-defense is not a defense under California law and the trial court properly instructed the jury on the lesser included offenses of voluntary and involuntary manslaughter.  Moreover, the trial court reasonably determined that there was no credible evidence that Petitioner believed he was acting in self-defense, see 28 U.S.C. § 2254(e)(1) (this Court will presume that the state court's factual findings are correct absent clear and convincing evidence to the contrary), and Petitioner has not directed the Court to any evidence in the record for a reasonable jury to find Petitioner acted in unreasonable self-defense, Matthews, 485 U.S. at 63.  Given that the jury ultimately rejected all self-defense theories, imperfect or otherwise, in concluding that Petitioner acted with the requisite malice to support a second-degree murder conviction, it is logical to assume that a more comprehensive instruction on unreasonable self-defense would not have affected their verdict.  See Henderson, 431 U.S. at 156 (reasoning that "since it is logical to assume that the jurors would have responded to an instruction on causation consistently with their determination of the issues that were comprehensively explained, it is equally logical to conclude that such an instruction would not have affected their verdict").  Accordingly, the Court rejects the suggestion that omission of a more complete instruction on unreasonable self-defense "so infected

1 | the entire trial that the resulting conviction violated due

2 | process." Estelle, 502 U.S. at 71-72.

3 |    Furthermore, as the Supreme Court recognized under similar

4 | facts in Henderson, the likelihood of obtaining relief based on this

5 | type of claim is remote.  In Henderson, the New York murder statute,

6 | under which the defendant was convicted, provided "'(a) person is

7 | guilty of murder in the second degree' when '(u)nder circumstances

8 | evincing a depraved indifference to human life, he recklessly

9 | engages in conduct which creates a grave risk of death to another

10 | person, and thereby causes the death of another person.'"

11 | Henderson, 431 U.S. at 148.  The defendant challenged the trial

12 | court's failure to specifically instruct the jury on the definition

13 | of causation, which the court of appeal defined as involving

14 | "ultimate harm" that "should have been foreseen." Id. at 152, 155.

15 | On federal habeas review, the Supreme Court stated:

16 |        In this case, the respondent's burden is
       especially heavy because no erroneous instruction was
17 |        given; his claim of prejudice is based on the failure
       to give any explanation beyond the reading of the
18 |        statutory language itself of the causation element. An
       omission, or an incomplete instruction, is less likely
19 |        to be prejudicial than a misstatement of the law.

20 | Id. at 155.  Upon the facts before it, the Supreme Court concluded

21 | that in light of the other instructions given in the case, omission

22 | of more complete instructions on the causation issue did not "so

23 | infect[] the entire trial that the resulting conviction violated due

24 | process." Id. at 156.  The jurors had been instructed on

25 | recklessness and returned a verdict finding that the defendant had,

26 | in fact, been reckless. Id.  Because a finding of recklessness

27 | necessarily includes a determination that the ultimate harm was

28 | foreseeable (the definition of causation), the jury did find

1    causation and the Court, therefore, concluded that an additional

2    instruction would not likely have affected the verdict.   Id.

3    Moreover, the Supreme Court determined that even if it made the

4    assumption that the jury would have reached a different verdict upon

5    hearing the additional instruction, "the possibility is too

6    speculative to justify the conclusion that constitutional error was

7    committed." Id. at 157.

8        This Court finds the instant case analogous to Henderson.

9    Here, the Court need not even make as great an inference as the

10   Henderson court because in this case the trial court actually

11   instructed the jury twice on unreasonable self-defense.   Though

12   CALJIC 5.17 provides more elaboration, the jurors were fully

13   informed that unreasonable self-defense negates the element of

14   malice aforethought necessary for a murder conviction.   They

15   nonetheless convicted him of second degree murder, thus implying

16   that the omission of the instruction did not "so infect[] the entire

17   trial that the resulting conviction violated due process." Estelle,

18   502 U.S. at 71-72.   Furthermore, the substantial coverage of this

19   issue by the voluntary and involuntary manslaughter instructions,

20   coupled with the absence of credible evidence of unreasonable self-

21   defense, supports the Court of Appeal's conclusion that the jury's

22   conclusion would have been the same even if the trial court had

23   instructed with CALJIC 5.17 and that any error, therefore, was

24   harmless. Brecht, 507 U.S. at 637; Bonin, 59 F.3d at 823-24.

25       Accordingly, this Court concludes that Petitioner's claim

26   does not provide a basis for federal habeas relief and **RECOMMENDS**

27   that Petitioner's second ground for relief be **DENIED**.

28

1    C.      Ground 3 - Admission of Photographs of the Victim

2        In his third ground for relief, Petitioner alleges that the

3    trial court abused its discretion in admitting inflammatory and

4    unnecessary photographs of the victim's head.    Pet. at 8.

5    Petitioner argues that the highly prejudicial nature of these

6    photographs greatly exceeded their probative value and likely

7    influenced the jury to impose a second degree murder conviction as

8    a compromise.    Id.

9        Respondent submits that Petitioner has once again failed to

10   state a federal claim but that, regardless, the state court's

11   rejection of his claim regarding the admission of these photographs

12   was not contrary to or an unreasonable application of United States

13   Supreme Court law nor was it an unreasonable factual determination.

14   Resp't Mem. at 19-20.

15       The Court of Appeal succinctly described the factual

16   background of this issue as follows:

17       A.   *Background*

18           At trial, the people sought to introduce
         photographs of the crime scene, including depictions
19       of Sanchez as officers found him, as well as photos
         taken at the autopsy that depicted his injuries.
20       Defense counsel objected under Evidence Code section
         352 that photos depicting Sanchez's head injuries were
21       prejudicial and cumulative of testimony.  The People
         responded that the photos were highly relevant and
22       probative to show the malice necessary to support a
         first degree murder conviction, the injuries suffered
23       by Sanchez, and the savageness of the attack.    The
         People also argued that the photographs would assist
24       the jury in understanding expert testimony.

25           The court, after weighing the pictures' prejudice
         against their relevance, decided that one photograph
26       depicting Sanchez at the crime scene and one
         photograph of his head injuries taken at the autopsy
27       would be admitted.  The court found that although the
         photographs were gruesome, they were highly probative
28       of the central issue in the case: Bates's mental

1    state.

2        The court also tried to devise a manner in which
     to present the photographs in the least sudden or
3    upsetting fashion.  The crime scene photograph was
     presented as part of a photoboard, which included
4    pictures of the four rocks, Sanchez, and the backpack,
     which demonstrated the directionality of the blood
5    drops, as well as the positioning of the rocks.  The
     court also ruled that the photographs would be
6    introduced during voir dire in order to further guard
     against any emotional disturbance of shock.

7

8    Lodgment 5 at 17-18.  After setting forth the applicable state law

9    regarding the trial court's discretion in admitting prejudicial

10   evidence under California Evidence Code § 352, the Court of Appeal

11   concluded as follows:

12       Here, the court did not abuse its discretion in
     allowing the photographs into evidence.  The court
13   only allowed two out of numerous photos depicting
     Sanchez's massive head wounds.  The court also
14   attempted to minimize the potential shock or prejudice
     by presenting them during voir dire.  Additionally,
15   the photos were highly probative because they
     accurately depicted the injuries, were relevant to a
16   determination of malice, and assisted the pathologist
     testifying to the cause of death.  Thus, the court did
17   not abuse its discretion by admitting photographs of
     Sanchez's head injuries.

18

19   Id. at 18-20.

20       Generally, the admissibility of evidence is a matter of state

21   law, and is not reviewable in a federal habeas corpus proceeding.

22   See Estelle, 502 U.S. at 67; Middleton v. Cupp, 768 F.2d 1083, 1085

23   (9th Cir. 1985).  Notwithstanding this general proposition, a trial

24   court's admission of prejudicial evidence may warrant habeas relief

25   if the admission was fundamentally unfair and resulted in a denial

26   of due process.  Estelle, 502 U.S. at 72.  The failure to comply

27   with state rules of evidence alone, however, is neither a necessary

28   nor a sufficient basis for granting federal habeas relief on due

1   process grounds.  <u>See</u> <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20

2   (9th Cir. 1991).  Only if there are no permissible inferences that

3   the jury may draw from the evidence can its admission rise to the

4   level of a due process violation.  <u>Id.</u> at 920.  Even then, the

5   evidence in question must "be of such quality as necessarily

6   prevents a fair trial." <u>Id.</u> (quoting <u>Kealohapauole v. Shimoda</u>, 800

7   F.2d 1463, 1465 (9th Cir. 1986)).

8       As an initial matter, Respondent is correct that nowhere in

9   Petitioner's claim does he argue that admission of these photographs

10  violated clearly established federal law as determined by the

11  Supreme Court.  Therefore, this issue is inappropriate for § 2254

12  review.  <u>Houston v. Roe</u>, 177 f.3d 901, 910 n.6 (9th Cir. 1999).

13      However, even if Petitioner had alleged that the trial

14  court's actions rose to the level of a federal due process

15  violation, his claim would fail.  In order to demonstrate a due

16  process violation, Petitioner must show that there are no

17  permissible inferences that the jury could have drawn from the

18  evidence.  <u>Jammal</u>, 926 F.2d at 919-20.  As the appellate court

19  explained, the photographs in this case helped the jury determine

20  whether or not Petitioner acted with malice when he killed Sanchez.

21  The trial judge instructed the jury that:

22          Malice, as used in malice aforethought, may be
            either express or implied.

23
            Malice is express when there is manifested an
24      intention unlawfully to kill a human being.

25          Malice is implied when:

26          1.   The killing resulted from an intentional
                 act;

27
            2.   The natural consequences of the act
28               are dangerous to human life; and

1      3. The act was deliberately performed with
          knowledge of the danger to, and with
2          conscious disregard for, human life.

Lodgment 2, vol. 4 at 606-07. Under these instructions, the photographs depicting how Sanchez' head was so torn apart that his brain had actually been pushed out of his head certainly would allow the jury to infer that Petitioner struck Sanchez with the intent to kill him. Alternatively, the photographs support the inference that Petitioner acted with conscious disregard for human life when he hit Sanchez in the head, repeatedly, with several large rocks. The extent of Sanchez' injuries, as evidenced in the photographs, also could lead the jury to the conclusion argued by Petitioner's counsel — that Petitioner acted in the heat of passion and thus, was guilty only of voluntary manslaughter. Lodgment 2, vol. 4 at 578-581 (defense counsel's closing argument that "what this horrible, gruesome picture shows . . . [is] heat of passion"). In sum, it cannot be said that no permissible inference could be drawn from the photographs, Jammal, 926 F.2d at 919-20, such that their admission was fundamentally unfair and resulted in a denial of due process, Estelle, 502 U.S. at 72. In addition, the Court notes that the trial court attempted to minimize the prejudice by limiting the number of photographs presented to the jury and the manner in which they were presented. Lodgment 5 at 17-20.

Accordingly, this Court finds that the California Court of Appeal's decision denying Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law. See Williams, 529 U.S. at 412-13. The Court, therefore, **RECOMMENDS** that Petitioner's third ground for habeas relief be **DENIED**.

1

### CONCLUSION AND RECOMMENDATION

2    In sum, this Court finds that Petitioner has failed to

3 establish that the California Court of Appeal's decision as to his

4 claims was contrary to, or an unreasonable application of, clearly

5 established federal law.  See 28 U.S.C. § 2254(d).  Nor has

6 Petitioner made any argument that further factual development is

7 necessary, such that an evidentiary hearing would be warranted.  See

8 28 U.S.C. § 2254(e)(2) (exceptions where an evidentiary hearing may

9 be appropriate).  As such, this Court **RECOMMENDS** that Petitioner's

10 Petition for Writ of Habeas Corpus be **DENIED** and the case dismissed

11 with prejudice.

12    For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that

13 the District Court issue an Order: (1) approving and adopting this

14 Report and Recommendation, and (2) directing that Judgment be

15 entered denying the Petition.

16    **IT IS HEREBY ORDERED** that any written objections to this

17 Report must be filed with the Court and served on all parties **no**

18 **later than February 22, 2008**.  The document should be captioned

19 "Objections to Report and Recommendation."

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1        **IT IS FURTHER ORDERED** that any reply to the objections shall

2   be filed with the Court and served on all parties **no later than**

3   **March 7, 2008**.    The parties are advised that failure to file

4   objections within the specified time may waive the right to raise

5   those objections on appeal of the Court's order.    See <u>Turner v.</u>

6   <u>Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998).

7

8   DATED:  February 8, 2008

9

10                          BARBARA L. MAJOR
                            United States Magistrate Judge

11

12  COPY TO:

13  HONORABLE MARILYN L. HUFF
    UNITED STATES DISTRICT JUDGE

14
    ALL COUNSEL AND PARTIES

15

16

17

18

19

20

21

22

23

24

25

26

27

28