1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11   MARK BATES,

12                                    Petitioner,

13          vs.

14   KEN CLARK, Warden,

15                                    Respondent.

CASE NO. 07-CV-0330 H (BLM)

**ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING PETITION FOR WRIT OF HABEAS CORPUS**

16
17          On February 20, 2007, petitioner Mark Bates ("Petitioner"), a state prisoner

18   proceeding *pro se*, filed a petition for writ of habeas corpus pursuant to 28 U.S.C.

19   § 2254.  (Doc. No. 1.)  On July 16, 2007, respondent Ken Clark ("Respondent") filed

20   an answer.  (Doc. No. 9.)  On February 8, 2008, the magistrate judge filed a Report and

21   Recommendation.  (Doc. No. 13.)  The magistrate judge ordered objections filed by

22   February 22, 2008.  As of the date of this Order, Petitioner has not filed objections to

23   the Report and Recommendation.  For the reasons set forth below the Court ADOPTS

24   the Report and Recommendation and DENIES the Petition.

25                                        **Background**

26   **A.     The Crime and Investigation**

27          Petitioner is currently serving a sentence of sixteen years to life in Corcoran State

28   Prison for the murder of Jose Sanchez.  (Petition ("Pet.") 1.)  Both Petitioner and the

victim were transients living in San Diego at the time of the killing. (Lodgment 5 at 2.) On October 21, 2003, at approximately 10:00 p.m., police responded to a 911 call made from the Centro Cultural de la Raza ("center") in Balboa Park, San Diego, and found the victim, Mr. Sanchez, lying on the ground near the center. (Id. at 3.)  His head had been smashed to such a degree that he appeared headless. (Id.)  Police officers found Petitioner near the scene. (Id.)  The woman who called 911 told police that Petitioner had banged on the door of the center and told her that the victim was hurt. (Id.) Petitioner had blood on his pants and was wearing his sweatshirt inside out. (Id.) Police later determined that there was blood on the outside of Petitioner's sweatshirt as well. (Id.)  The police found four rocks near the victim's body; all four rocks had the victim's blood and brain tissue on them. (Id.)  In response to some initial questions by police officers at the scene, Petitioner said that he knew the victim, had found him lying motionless, and had tried to revive him with CPR. (Id.)  The police subsequently took Petitioner into custody.

After Petitioner was placed in custody, Detectives Kenneth Brown and Ed Valentine interviewed him. (Lodgment 1 vol. 2 at 202.)  Prior to informing Petitioner of his Miranda rights, the detectives asked only basic informational questions such as the spelling of his name, where he lived, his age, his level of education, and the phone number of any family contacts. (Id. at 202-04.)  Detective Brown then informed Petitioner of each of his Miranda rights, and asked after each one whether Petitioner understood the right. (Id.)  Petitioner affirmatively responded that he understood each of the rights Detective Brown read to him. (Id.)  Detective Brown then asked, "Do you want to tell me what happened tonight out there?" (Id.)  Petitioner immediately began telling his version of the events, relating that he knew the victim and that he and the victim had gotten into an argument earlier in the day. (Id. at 206-11.)  Petitioner said that following the argument, he had gone to another part of the park for a few hours, and that when he returned he found the victim laying motionless. (Id.)  Petitioner stated that he had tried to perform CPR on the victim and had then gone to the nearby cultural

center to get help.  (Id.)  During this custodial interview of Petitioner the following

dialogue occurred:

Brown: Did you happen to see the condition of his head?

Petitioner: No I didn't.

Brown: Why didn't you? If you're down, I'll tell you right now, if you're down doing CPR, you're, you're going to be able to see that.

Petitioner: I didn't see the condition of his head.

Brown: Okay.

Valentine: Mark, the thing is this, we're not saying you're a bad guy. Okay, Mark. You know, we're just saying that maybe you got upset. . .

Petitioner: No.

Valentine: . . . and, listen to me, listen to me, okay, maybe you got upset, Jose was picking on you, was calling you names or whatever he might have been doing to you and you guys had a little argument and it turned into a fight and it got out of control. You know then, after, after, then you realized what happened and you went to get help. Because you didn't want anything bad to happen. You didn't want to hurt him, you know, and that's, that's what we're asking. We want to find out what happened. Maybe that's what occurred. But we need to hear it from you, cause unless you're a bad guy, we just want to know if maybe it was something that just got out of control and you didn't mean to do it.

Brown: Yea, that's what, that's that's very true, sometimes people, they don't mean to hurt somebody and you know you tried to go get help, you weren't sure and that's why you went to the community place. Isn't that what happened?

Petitioner: I'm not saying anything right now.

Brown: Basically here's the deal. Listen to me. That's why we're trying to give you an opportunity. Why don't you tell us what happened?

Valentine: And if it happened the way we were saying, that I was telling you, or he was telling you, then we need to know, we need to find out, okay, that, we're trying to help you out. That's basically what we're trying to do.

Brown: I want to find, people like I was saying, sometimes things happen, you go to try to get help, you mean well by it, but things get out of control. Okay. And I think, I think that you seem like a decent guy, you went to try to get help, didn't you?

Petitioner: I sure did. (Unintel).

Brown: Well why don't you just tell us what happened and how, why you needed to try to get help? I think it's, listen to me, I think it's very important, you're at a very important time in your life right now. Okay,

and I think you know and I know deep down what happened. I think it's not hard by looking at what happened. But I think it's important to find out the truth of the matter and I think the truth of the matter is that you can tell us what occurred. And that you probably tried to get help because you wanted to help your friend and that something happened. Why don't you tell us what happened?

Petitioner: I just want to know what I'm facing?

Brown: I don't know what you're facing right now. That's up to the district attorney to determine that stuff, but we need to find out what occurred. Did you hurt that man? Why don't you just tell us what happened?

Petitioner: Yea, I hurt him.

(Lodgment 1 vol. 2 at 221-22.)

Petitioner then admitted killing the victim by smashing his head four times with one of the rocks found near the victim's body. (<u>Id.</u> at 223.) Petitioner said he attacked the victim because he "was mad at him . . . [a]bout the fight that we had during the day." (<u>Id.</u> at 224.) At first Petitioner admitted that the victim had just been lying silent and motionless when he hit him with the first rock. (<u>Id.</u> at 231, 234.) After admitting that he also hit the victim in the head and the chest and kicked him violently, Petitioner revised his story, saying that the victim was "getting mad and speaking Spanish" and "trying to get up and hurt me." (<u>Id.</u> at 238-40.)

**B.     The Trial**

During the trial Dr. Steven Campman, a deputy medical examiner for San Diego County, testified about the victim's injuries. He stated that the victim's head above the upper lip was "torn apart" and that all the bones of his skull were broken. (Lodgment 2 vol. 3 at 353.) All the brain material had been forced out of the victim's head. Additionally, the victim's hyoid bone, uppermost vertebra, left shoulder blade, and several ribs had been broken. (<u>Id.</u> at 355, 357.) Dr. Campman also testified that the victim's blood alcohol level was 0.39 percent at the time of death. (<u>Id.</u> at 368.)

Brian Kennedy, a blood spatter expert, also testified during the trial. He opined that the blood stains of Petitioner's pants were not consistent with doing CPR, but were consistent with smashing down a large rock four times or more. (<u>Id.</u> at 468.)

Dr. Raymond Murphy, a psychologist, testified during the trial that Petitioner had a 75 IQ, which was in the "borderline range of intelligence" and "at that stage where it can be considered a level of retardation." (Id. at 480.)  Dr. Murphy stated that he believed Petitioner to be in the six- to eight-year-old range of functioning for basic psychomotor skills and in the eight- to ten-year-old range emotionally. (Id. at 481, 482.) Dr. Murphy testified that this level of cognition would affect Petitioner's ability to plan activities and make decisions, and that Petitioner's emotional functioning would cause him to become easily frustrated under certain situations. (Id. at 483-84.)

Dr. Lynette Rivers also testified during the trial.  She stated that Petitioner had an IQ of 79, above the mildly retarded range, but classifiable as borderline intellectual functioning. (Id. at 526-27.)  Dr. Rivers stated that, based on her review of the transcript of the detectives initial custody interview of Petitioner, he appeared to respond appropriately to the detective's questions and used fairly sophisticated words that evidenced some higher functioning verbal abilities. (Id. at 535.)  She also stated that Petitioner's explanations of the events surrounding the killing showed an ability to plan and formulate new ideas. (Id. at 535-36.)

During the trial, the government sought to introduce photographs of the crime scene and the autopsy.  Defense counsel objected to the introduction of photographs under California Evidence Code § 352 on the grounds that the photographs of the victim's head  were overly prejudicial and cumulative of testimony. (Lodgment 2 vol. 1 at 16.) After considering the prejudicial nature of the photographs, the trial court concluded that the pictures were highly relevant on the issue of malice and could help explain the testimony of expert witnesses. (Id. at 97.)  However, in order to limit the prejudicial effect of the photographs, the trial court admitted only one picture of the victim's head taken at the crime scene and one taken during the autopsy. (Lodgment 5 at 18.)  The photo from the crime scene was presented as part of a photoboard, which included other pictures of the crime scene depicting the positioning of the victim's body and the rocks, and the directionality of the blood drops. (Id.)

1    The trial court instructed the jury on first and second degree murder and

2  voluntary and involuntary manslaughter. (Lodgment 2 vol. 4 at 610-13.)  Though the

3  manslaughter instructions referred to unreasonable self-defense, the court did not

4  instruct the jury on the detailed definition of unreasonable self-defense, and defense

5  counsel did not request such an instruction. (Id. at 547, 587-625.)

6    On July 9, 2004, a jury found Petitioner guilty of second degree murder and

7  found that Petitioner had used a dangerous weapon – the rock – in committing the

8  murder. (Lodgment 2 vol. 4 at 632.)  The trial court sentenced Petitioner to fifteen

9  years to life for the murder conviction and to one additional year, to run consecutively,

10  for using a deadly weapon. (Id. at 644.)

11  **C.    The Habeas Petition**

12    Petitioner raises three grounds for relief in this petition for habeas corpus.  First,

13  Petitioner alleges that the trial court violated his due process rights by allowing the jury

14  to consider statements made after he allegedly invoked his constitutional right to remain

15  silent, or alternatively, that Petitioner's diminished mental capacity prevented an

16  effective Miranda warning. (Pet. 6-7b.)[1] Second, Petitioner contends that the trial court

17  violated his due process rights by not offering *sua sponte* a jury instruction on

18  unreasonable self-defense. (Pet. 7a.)  Lastly, Petitioner claims that the trial court

19  erroneously admitted photographs of the victim's injuries. (Pet. 8a-8b.)

20  **Discussion**

21  **A.    Standard of Review**

22    The district court "shall make a *de novo* determination of those portions of the

23  report . . . to which objection is made," and "may accept, reject, modify, in whole or in

24  part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1).

25  The Court also reviews *de novo* the magistrate judge's conclusions of law. Barilla v.

26  Ervin, 886 F.2d 1514, 1518 (9th Cir. 1989).  Petitioner has not filed an objection to the

27

28  [1] The Petition has two pages numbered "7 " and two pages numbered "8."  The Court refers to the first of each of these in the order they appear in the Petition as "7a" and "8a" respectively and the second as "7b" and "8b" respectively.)

Report and Recommendation.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the following guidance for federal review of state court criminal proceedings:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.

State court findings of fact are presumed to be correct unless the petitioner rebuts the presumption with clear and convincing evidence. Arnold v. Runnels, 421 F.3d 859, 862 (9th Cir. 2005). Furthermore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). However, while "this standard requires us to give considerable deference to the state courts, AEDPA deference is not a rubber stamp." Anderson v. Terhune, 516 F.3d 781, 786 (9th Cir. 2008). Under section 2254, a federal court "cannot find constitutional error merely because a state court's decision conflicts with Ninth Circuit precedent." Arnold, 421 F.3d at 865 n.6. However Ninth Circuit decisions may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law." Id.

**1.      Whether Petitioner Invoked his Right to Remain Silent**

After police have given Miranda warnings, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda v. Arizona, 384 U.S. 436, 473-74 (1966). To invoke his right to silence, a suspect need not "provide any statement more explicit or

more technically-worded than 'I have nothing to say.'" <u>Arnold</u>, 421 F.3d at 865. However, "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants [to invoke the privilege] . . . . If the suspect's statement is not unambiguous or unequivocal . . . the officers have no obligation to stop questioning." <u>Davis v. United States</u>, 512 U.S. 452, 461-62 (1994).[2]  If "a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking his right to remain silent," the suspect's invocation of his Fifth Amendment rights is equivocal and the officers need not cease questioning.  <u>See</u> <u>Arnold</u>, 421 F.3d at 866 (quoting <u>Davis</u>, 512 U.S. at 459) (emphasis omitted).  Although the reviewing court may not use context as an excuse to make an unequivocal statement equivocal, the context in which the suspect makes the statement at issue remains important to determine whether the suspect intended to invoke his or her right to remain silent.  <u>See</u> <u>Anderson</u>, 516 F.3d at 787.

Here, Petitioner contends that the trial court's legal conclusion that Petitioner did not unambiguously invoke his right to remain silent by saying, "I'm not saying anything right now," was incorrect.  The Court concludes that the trial court's conclusion that Petitioner's statement was equivocal was not objectively unreasonable.  The trial court determined that, under the totality of the circumstances, a reasonable officer would not have interpreted Petitioner's statement as an unambiguous assertion of his right to silence.  Prior to making the statement, Petitioner was freely discussing the events surrounding the killing.  Detective Valentine then questioned Petitioner's version of events and confronted Petitioner with an alternative story in which Petitioner got into an argument with the victim and things got out of control.  Petitioner responded to this version of events by first saying "No," and then "I'm not saying anything right now."  Viewed in context, the trial court reasonably concluded that Petitioner's statement

---

[2] Although <u>Davis</u> involves a suspect's invocation of the right to an attorney, "the general principles from cases involving the clarity of invocation of rights during custodial interrogation are instructive as to common sense interpretation of language."  <u>Anderson</u>, 516 F.3d at 787 n.3.

1  indicated at most an unwillingness to talk about certain subjects or a strategic endeavor

2  to alter the course of the detectives' questions.

3       The Court has considered the facts of this case in light of the recent Ninth Circuit

4  decision in Anderson v. Terhune, 516 F.3d 781 (9th Cir. 2008), decided after the Report

5  and Recommendation was entered, and concluded that the facts here are sufficiently

6  different.  In Anderson, the suspect stated "I'm through with this. I'm through. I wanna

7  be taken into custody, with my parole . . . ." Id. at 786.  The suspect then stated "I plead

8  the [F]ifth" to which the police officer replied: "Plead the [F]ifth. What's that?"  Id.

9  Subsequently, the suspect even requested the presence of an attorney, but the

10 questioning continued, finally resulting in a confession.  Id.  Here Petitioner did not

11 make any other statements indicating that he wanted the questioning to stop, and unlike

12 the statement "I plead the Fifth," Petitioner's statement was at most an equivocal

13 assertion of the right to remain silent, which the detectives properly attempted to clarify.

14 See Davis, 512 U.S. at 461-62.  Following Petitioner's statement of "I'm not saying

15 anything right now," Detective Brown said: "Basically here's the deal. Listen to me.

16 That's why we're trying to give you an opportunity. Why don't you tell us what

17 happened?" (Lodgment 1 vol. 2 at 222.)  Petitioner did not reiterate his desire to stop

18 talking; on the contrary, he admitted, almost immediately, that he had killed the victim.

19      This Court may not "issue a writ simply because the court concludes in its

20 independent judgment that the relevant state-court decision applied clearly established

21 federal law erroneously or incorrectly . . . . Rather, that application must be objectively

22 unreasonable."  Andrade, 538 U.S. at 75-76.  The Court concludes that the state court

23 was not objectively unreasonable in concluding that Petitioner did not unequivocally

24 invoke his right to remain silent.

25 **2.     Whether the Miranda Warning was Effective**

26      "[A] valid waiver will not be presumed simply from the silence of the accused

27 after warnings are given or simply from the fact that a confession was in fact eventually

28 obtained." Miranda, 384 U.S. at 475.  A suspect waives Miranda rights only when he

or she makes the waiver "voluntarily, knowingly, and intelligently." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  Voluntary waiver means that the suspect relinquished his rights as a result of "a free and deliberate choice rather than intimidation, coercion, or deception."  <u>Id.</u>  Knowing and intelligent waiver means that  the suspect waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Id.</u>  A court may conclude that a suspect waived his Miranda rights only if the "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension . . . ."  <u>Id.</u>

**a.      Voluntary**

The Court concludes that Petitioner's waiver of his Miranda rights was voluntary, knowing, and intelligent.  There is no evidence in the record to suggest that Petitioner's waiver was the result of intimidation, coercion, or deception.  Prior the Miranda warning the police asked Petitioner only perfunctory informational questions.  There is there is no indication in the record that Petitioner was handcuffed during the interview or treated roughly while being brought into the interrogation room.  (<u>See</u> Lodgment 1 vol. 2 at 202-04.)  Accordingly, the Court concludes that the state courts' conclusion that Petitioner waived his Miranda rights voluntarily and without coercion, was not objectively unreasonable.

**b.      Knowing and Intelligent**

Although a "defendant's mental capacity directly bears upon the question whether he understood the meaning of his Miranda rights and the significance of waiving his constitutional rights," a court determines whether a suspect knowingly and intelligently waived his rights by considering the totality of the circumstances.  <u>U.S. v. Garibay</u>, 143 F.3d 534, 538 (9th Cir. 1998).  Factors a court should consider in making this determination include "whether the defendant signed a written waiver, . . . whether the defendant was advised of his rights in his native tongue, . . . whether the defendant appeared to understand his rights, . . . whether a defendant had the assistance of a

translator, . . . whether the defendant's rights were individually and repeatedly explained to him, . . . and . . . whether the defendant had prior experience with the criminal justice system . . . ." Id.

Here, the detective read each right to Petitioner individually and asked if Petitioner understood the right; Petitioner replied in each instance that he did. (Lodgment 1 vol. 2 at 204.) Petitioner had prior experience with the criminal justice system. (Lodgment 1 vol. 2 at 300.) The government's psychiatrist testified during trial that, although Petitioner was of borderline intelligence, he was not mentally retarded. (Lodgment 2 vol. 3 at 526-27.) Furthermore, Petitioner responded intelligently to the detectives questions, appeared to alter his story strategically in response to those questions, and asked relatively sophisticated questions about the legal consequences of his actions. (See, e.g., Lodgment 1 vol. 2 at 207-08, 229, 238-40, 242.) Under the totality of the circumstances, the Court concludes that the state court's determination that Petitioner knowingly and intelligently waived his Miranda rights was not objectively unreasonable.

**3.     Jury Instruction on Unreasonable Self-Defense**

Petitioner next contends that the trial court's failure to instruct the jury on the definition of unreasonable self-defense violated his federal due process rights. Before a federal court may overturn a state conviction involving an allegedly defective instruction, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). The question in such a case is whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Id. at 147. "An appraisal of the significance of an error in the instructions to the jury requires a comparison of the instructions which were actually given with those that should have been given." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). "A defendant is entitled to an instruction as to any recognized defense for which there

07cv0330

exists evidence sufficient for a reasonable jury to find in his favor." Matthews v. United States, 485 U.S. 58, 63 (1988). However, because "[o]rderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error[, i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson, 431 U.S. at 154.

The trial court gave the following instruction on voluntary manslaughter to the jury, based largely on CALJIC 8.40:

> Every person who unlawfully kills another human being without malice aforethought, but either with an intent to kill or with conscious disregard for human life, is guilty of voluntary manslaughter, in violation of Penal Code section 192, subdivision (a).
>
> There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury.
>
> The phrase, "conscious disregard for human life," as used in this instruction, means that a killing results from the doing of an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his or her conduct endangers the life of another and who acts with conscious disregard for life.
>
> In order, then, to prove this crime, each of the following elements must be proved:
>
> 1. A human being was killed;
> 2. The killing was unlawful; and
> 3. The perpetrator of the killing either intended to kill the alleged victim, or acted in conscious disregard for life; and
> 4. The perpetrator's conduct resulted in the unlawful killing.
>
> A killing, I remind you again, is unlawful if it was neither justifiable nor excusable.

(Lodgment 2 vol. 4 at 610.) The trial court also gave the following instruction on involuntary manslaughter to the jury, based largely on CALJIC 8.45:

> Every person who unlawfully kills a human being, without malice aforethought and without an intent to kill and without conscious disregard for human life, is guilty of the crime of involuntary manslaughter in violation of Penal Code section 192, subdivision (b).

1
2
There is no malice aforethought if the killing occurred in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury.

3
4
5
A killing in conscious disregard for human life occurs when a killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for human life.

6
A killing is unlawful within the meaning of this instruction if it occurred:

7
8
1. During the commission of an unlawful act not amounting to a felony which is dangerous to human life under the circumstances of its commission; or

9
10
11
12
2. In the commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection.
The commission of an unlawful act without due caution and circumspection, would necessarily be an act that was dangerous to human life in its commission.

13
14
In order to prove this crime, each of the following elements must be proved:
1. A human being was killed; and
2. The killing was unlawful.

15
(Lodgment 2 vol. 4 at 612-13.)

16
17
18
19
Petitioner contends that although the instructions on voluntary and involuntary manslaughter advise the jury that Petitioner did not act with malice if he acted in unreasonable self-defense, the trial court's failure to give CALJIC 5.17 violated his due process rights.  CALJIC 5.17 provides in pertinent part:

20
21
22
23
A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had such a belief. Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter.

24
25
As used in this instruction, an "imminent" [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.

26
27
28
[However, this principle is not available, and malice aforethought is not negated, if the defendant by [his] [her] [unlawful] [or] [wrongful] conduct created the circumstances which legally justified [his] [her] adversary's [use of force], [attack] [or] [pursuit].]

[This principle applies equally to a person who kills in purported

1    self-defense or purported defense of another person.]

2    The trial court's failure to give CALJIC 5.17 did not violate Petitioner's due

3    process rights.  This omission did not so infect the entire trial that the resulting

4    conviction violates due process.  Petitioner did not ask the trial court to give CALJIC

5    5.17, or any other instruction on unreasonable self-defense, and did not object to the

6    instructions the trial court gave. (Lodgment 2 vol. 4 at 547); see Henderson, 431 U.S.

7    at 154.

8    Furthermore, due process only requires that the trial court give an instruction

9    when it determines that there is "evidence sufficient for a reasonable jury to find in [the

10   defendant's] favor."  Matthews, 485 U.S. at 63.  Here, Petitioner initially told the

11   detectives that he snuck up on the victim and that the victim was just laying on the

12   ground motionless when Petitioner attacked him. (Lodgment 1 vol. 2 at 223.)  After

13   further questioning Petitioner revised his story, saying that the victim was yelling at him

14   and trying to get up and hurt him. (Id. at 240.)  The Court of Appeal determined that

15   Petitioner's "later attempt to justify the killing by telling detectives that Sanchez had

16   'come at him' was simply not credible. . . ." (Lodgment 5 at 15.)  Accordingly, the

17   Court concludes that the trial court's failure to instruct the jury on the definition of

18   unreasonable self-defense did not violate Petitioner's due process rights.

19   **4.    Admission of Photographs of the Victim**

20   An inquiry into whether the trial court violated state evidence law is "no part of

21   a federal court's habeas review of a state conviction." Estelle v. McGuire, 502 U.S. 62,

22   67 (1991).  "In conducting habeas review, a federal court is limited to deciding whether

23   a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68.

24   Therefore, the issue to be decided on habeas review is "whether the trial court

25   committed an error which rendered the trial so arbitrary and fundamentally unfair that

26   it violated federal due process." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir.

27   1991) (quoting Reiger v. Christensen, 789 F.2d 1425, 1430 (9th Cir. 1986)).  Admission

28   of evidence violates federal due process only when there are "no permissible inferences

the jury may draw from the evidence" and, furthermore, the evidence is "of such quality as necessarily prevents a fair trial." Jammal, 926 F.2d at 920.

Petitioner does not allege that the trial court's admission of the photographs violated any clearly established federal law as determined by the Supreme Court. (See Pet. 8a, 8b.) Accordingly, the Court concludes that Petitioner fails to allege a claim for federal habeas review regarding the admission of the photographs. However, even if the Petition did state a federal habeas claim, the Court concludes that the admission of the photographs did not violate Petitioner's federal due process rights.

A central issue for the jury was whether Petitioner acted with malice in order to support a charge of second degree murder. The trial judge instructed the jury that:

> Malice, as used in malice aforethought, may be either express or implied.
>
> Malice is express when there is manifested an intention unlawfully to kill a human being.
>
> Malice is implied when:
>
> 1. The killing resulted from an intentional act;
> 2. The natural consequences of the act are dangerous to human life; and
> 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

(Lodgment 2 vol. 4 at 607.) The photographs depicting the extent of the victim's injuries were relevant to show either that Petitioner intended to kill the victim or acted with conscious disregard for human life. The photographs also assisted the forensic specialist in testifying about the crime scene. (See Lodgment 2 vol. 3 at 332.) Furthermore, the trial court attempted to minimize the emotional impact of the photographs by limiting the number of photographs depicting the victim's head wound to two, one from the crime scene and one from the autopsy, and presenting these two photographs as part of a photoboard that included other pictures of the crime scene. (Lodgment 5 at 18.) The Court concludes that the jury could draw permissible inferences from the photographs. Therefore, the trial court's admission of these photographs did not violate Petitioner's due process rights under the U.S. Constitution. See Kealohapauole v. Shimoda, 800 F.2d 1463, 1466 (9th Cir. 1986) (holding

admission of videotape of autopsy of murder victim who died from a fractured skull and whose body was badly decomposed did not violate due process); <u>Batchelor v. Cupp</u>, 693 F.2d 859, 865 (9th Cir. 1982) (holding state trial court's admission of photographs of the female murder victim's naked body not error, let alone "error of constitutional magnitude").

### Conclusion

For the reasons stated above, the Court ADOPTS the Report and Recommendation and DENIES Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court grants a certificate of appealability as to whether Petitioner invoked his right to remain silent and denies a certificate as to the other issues.

IT IS SO ORDERED.

DATED: April 16, 2008

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

COPIES TO:
All parties of record.

07cv0330